Ray **MARSHALL**, Secretary of
Labor, Petitioner,

v.

The **ANACONDA COMPANY**, Montana Mining Division (Great Falls Refinery), and Occupational Safety and Health Review Commission, Respondents.

No. 78–1637.

United States Court of Appeals, Ninth Circuit.

May 3, 1979.

Diane E. Burkley, U. S. Dept. of Labor, Washington, D. C., Edward Klein, Atty., U. S. Dept. of Labor, Washington, D. C., for petitioner.

Stephen M. Williams, Butte, Mont., for respondents.

Before SNEED and ANDERSON, Circuit Judges, and D. WILLIAMS,* District Judge.

---

\* Honorable David W. Williams, United States District Court Judge, for the Central District of California, sitting by designation.

1. 29 U.S.C. § 661(i) provides, in part:
　(i) A hearing examiner . . . shall hear, and make a determination upon, any proceeding instituted before the Commission

SNEED, Circuit Judge:

The Secretary of Labor petitions to review and set aside an order of the Occupational Safety and Health Review Commission issued January 26, 1978. The Secretary issued citations in June 1977 against respondent Anaconda Company for violations of 29 C.F.R. § 1910.179, a safety standard governing overhead and gantry cranes, occurring at Anaconda's copper refinery at Great Falls, Montana. Respondent duly contested the citations and proposed penalty. The administrative law judge vacated the Secretary's order, holding that the standard involved was merely advisory as to cranes in service before August 31, 1971. The Commission did not assert its discretionary review power and the decision of the administrative law judge became final by operation of 29 U.S.C. § 661(i).[1] This court has jurisdiction under 29 U.S.C. § 660(b). We deny the petition to review.

## I.

### FACTUAL BACKGROUND.

#### A. Regulatory Framework.

On April 28, 1971, the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 et seq., became effective. The Act empowered the Secretary of Labor "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C. § 651(b)(3). It also created the Occupational Safety and Health Review Commission (Commission) "for carrying out adjudicatory functions" of the Act. *Id.* The Secretary adopted the regulations at issue in this case under section 6(a) of OSHA, 29 U.S.C. § 655(a). Congress intended that section to speed implementation of OSHA's purpose by authorizing the Secretary to promulgate as an occupational safety and health stan-

. . . .. The report of the hearing examiner shall become the final order of the Commission within thirty days . . . unless within such period any Commission member has directed that such report shall be reviewed by the Commission.

dard without notice and hearing, "any national consensus standard . . . unless he determines that the promulgation of such a standard would not result in improved safety or health for specifically designated employees."[2] *Id.*

On May 29, 1971, one month after OSHA's effective date, the Secretary adopted a broad range of industry standards as occupational health and safety standards. These became new Part 1910 of the Code of Federal Regulations. 36 Fed.Reg. 10466 (May 29, 1971). Among the regulations adopted were those at issue here which deal with overhead and gantry cranes, 29 C.F.R. 1910.179(e)(4) ["(e)(4)"] and 1910.179(g)(3)(i) ["(g)(3)(i)"]. These cranes are large industrial machines with a hoisting mechanism used to lift and lower a load. These cranes can span the width of a building and move back and forth from side to side on a girder structure called a bridge. The bridge girder moves horizontally the length of the building on a fixed runway or set of rails, moving on trolleys. The wheeled portion of the trolley is the "truck." Section e(4) requires the use of rail sweeps on the trucks to move persons or objects off the track before they are contacted by the bridge wheel. Sweeps also prevent jolts that may cause loads to swing dangerously or fall if wheels run over obstructions on the tracks. Section (g)(3)(i) requires cranes to be equipped with a device that automatically disconnects the three motors that drive the crane from the power source in the event of a power failure. This disconnection pre-

vents unexpected crane movement when power resumes after the failure. The Secretary adopted these standards from a safety code originally formulated in 1967 by the American National Standards Institute (ANSI). The OSHA standards here involved were taken verbatim from Chapter 2–1 of the ANSI Code, sections 2–1.7.4(a) and 2–1.9.3(a).[3]

The ANSI standards distinguished between rules that were mandatory and those that were merely advisory. Part V of the ANSI Code Introduction explained how the two were differentiated:

> Mandatory rules of this Code are characterized by the use of the word "shall." If a rule is of an advisory nature it is indicated by the use of the word "should" or is stated as a recommendation.

The Secretary, however, did not carry over this definition section when adopting the ANSI standards as OSHA regulations. Because he stated an intention to adopt entirely mandatory regulations, such a definition section was superfluous.

The dispute in this case turns on the purport of 29 C.F.R. § 1910.179(b)(2) ["(b)(2)"]. That OSHA regulation derives from Section IV of the ANSI Code Introduction, which stated:

> After the date on which this Code becomes effective, all new construction and installations *shall* conform to its rules. Equipment installed prior to that date *should* be modified to conform to its rules unless administrative or regulatory au-

---

**2.** 29 U.S.C. § 652(8) defines an "occupational safety and health standard" as "a standard which requires conditions, or adoption or use of one or more practices . . . reasonably necessary or appropriate to provide safe and healthful employment." Section 652(9) defines a "national consensus standard" as:

> any occupational safety and health standard or modification thereof which (1) has been adopted and promulgated by a nationally recognized standards-producing organization under procedures whereby it can be determined by the Secretary that persons interested and affected by the scope or provisions of the standard have reached substantial agreement on its adoption, (2) was formulated in a manner which afforded an opportunity for diverse views to be considered and (3) has

been designated as such a standard by the Secretary, after consultation with other appropriate Federal agencies.

**3.** These ANSI standards, which became the regulations specified, were:

2–1.7.4(a) Bridge trucks shall be equipped with sweeps which extend below the top of the rail and project in front of the truck wheel.

2–1.9.3(a) Cranes not equipped with spring-return controllers or momentary contact pushbuttons shall be provided with a device which will disconnect all motors from the line on failure of power and will not permit any motor to be restarted until the controller handle is brought to the "off" position, or a reset switch or button is operated.

thorities deem that the equipment as installed cannot economically be altered and that the equipment substantially complies with the requirements of the Code.

(Emphasis added). As adopted, (b)(2) included two confusing substitutions. The term "design specification" was substituted for ANSI's "construction and installation" language; in addition, "*shall* be modified" was inserted in lieu of ANSI's "*should* be modified . . . unless." Thus, (b)(2) originally stated:

> All the new overhead and gantry cranes installed after the effective date of the regulations in this subpart shall meet the *design specifications* of the American National Standard Safety Code for Overhead and Gantry Cranes, ANSI B30.2.0.– 1967. *Equipment constructed and installed prior to the effective date of this subpart shall be modified to conform to these specifications.*

29 C.F.R. § 1910.179(b)(2), 36 Fed.Reg. 10618 (May 29, 1971) (emphasis added).

Ten weeks later, the Secretary amended (b)(2). 36 Fed.Reg. 15101 (August 13, 1971). As amended, it stated:

> All new overhead and gantry cranes constructed and installed on or after August 31, 1971, shall meet the design specifications of the American National Standard Safety Code for Overhead and Gantry Cranes, ANSI B30.2.0–1967. *Overhead and gantry cranes constructed before August 31, 1971, should be modified to conform to those design specifications by February 15, 1972, unless it can be shown that the crane cannot feasibly or economically be altered and that the crane substantially complies with the requirements of this section.*

(Emphasis added). Thus, "design specifications" remained in (b)(2) and "should be modified . . . unless" returned to the position it had in the ANSI Code Introduc-

tion. The accompanying explanation[4] sowed further seeds of confusion by stating that (b)(2) was "revised in order to give some time for the modification of existing overhead and gantry cranes, and to reflect accurately the [ANSI] standard from which the provision is derived." *Id.* Further, the Federal Register notice specified that notice and public procedures were unnecessary because the changes were nonsubstantive.

### B. Alleged Violations.

Such was the regulatory framework when the alleged violations occurred. Between April 25 and May 9, 1977, OSHA compliance officers inspected the Anaconda refinery at Great Falls, Montana. On June 2, 1977, the Secretary issued citations *inter alia* for nonserious violations under section 5(a)(2) of the Act for failure to comply with (e)(4) and (g)(3)(i). The bridge trucks of eleven Anaconda cranes are not equipped with rail sweeps specified in (e)(4); five of the eleven additionally are not equipped with the power disconnecting devices required in (g)(3)(i). The Secretary proposed a $60 penalty for each item, $120 in all, and directed abatement by November 1 of that year. Anaconda timely contested the citation and proposed penalty pursuant to 29 U.S.C. § 659(c); the Secretary's formal complaint and Anaconda's answer followed; and the parties submitted stipulated facts for the presiding judge in lieu of an administrative hearing. The parties stipulated that each of the cranes described in the citation lacked the disconnect devices and/or the sweeps required by the cited standard, and that these cranes were constructed and placed in service before August 31, 1971. The only issue, therefore, was whether the cited standards required that pre-August 1971 cranes be modified to comply with the standards.

On December 27, 1977, the administrative law judge vacated the citation and proposed penalty. He held (e)(4) and (g)(3)(i) merely

---

4. 29 U.S.C. § 655(e) requires:

   (e) Whenever the Secretary promulgates any standard, makes any rule, order, or decision, grants any exemption or extension of time, or compromises, mitigates, or settles any penalty assessed under this chapter, he shall include a statement of the reasons for such action, which shall be published in the Federal Register.

advisory as to cranes in service before August 31, 1971. The judge determined that the applicability of the regulations to the cited cranes is controlled by the meaning of "should" in (b)(2). The Secretary unsuccessfully petitioned the Commission for discretionary review, and the decision became a final order of the Commission by operation of law on January 26, 1978, 29 U.S.C. § 661(i), 29 C.F.R. 2200.90(b)(3).

## II.

## WERE THESE STANDARDS "DESIGN SPECIFICATIONS"?

To determine whether (b)(2) requires modification of pre-August 1971 cranes, our first concern is whether "design specifications" as used in (b)(2) embraces the (e)(4) and (g)(3)(i) standards. If it does not, then (b)(2) affords no basis to assert that (e)(4) and (g)(3)(i) are other than mandatory. Anaconda, of course, argues that the reference to ANSI "design specifications" refers to those specifications in § 1910.179 derived from the ANSI Code, including (e)(4) and (g)(3)(i). The Secretary, equally understandably, contends that the more narrow "design specifications" intentionally replaced "rules" in the ANSI Code Introduction Section IV. He presents two arguments against (e)(4) and (g)(3)(i) fitting this designation.

First, the Secretary points out that many ANSI provisions that might be considered design specifications were not adopted into § 1910.179. Accordingly, he argues, reference in (b)(2) to the ANSI standards design specifications refer to those specifications not incorporated into § 1910.179. The Secretary's second argument is that even if (b)(2) applies to some of the provisions of § 1910.179, the devices omitted in this case do not constitute design specifications. Under this suggested definition, "design specifications" are engineering specifications that determine the basic design, not including the simple remedial devices involved in the instant case. He stresses that the required devices are unconcerned with the crane's basic design and may be added easily by employers after installation.

The Commission has refused to accept either of the Secretary's arguments. In *United States Steel Corp.*, OSHRC Nos. 10825 and 10849, 5 O.S.H.C. 1289, 1292 (1977), the Commission noted first that some of the provisions of § 1910.179 are unquestionably design specification standards. It then said:

The distinction between old and new equipment originated in Section IV of the Introduction to ANSI standard, and applied to the "construction and installation" requirements of the ANSI standard.

. . . .

. . . [I]n amending 1910.179(b)(2) to its present form, [the Secretary] stated that the amendment was intended to reflect accurately the ANSI standard from which 1910.179(b)(2) was derived. . . . Thus, in using the term "design specifications," [the Secretary] must have intended that term to coincide with the "construction and installation" requirements of the ANSI standard.

5 O.S.H.C. at 1292–93. *See Pittsburgh-Des Moines Steel Co.*, OSHRC No. 13708, 5 O.S. H.C. 1420 (1977) and *Wheeling-Pittsburgh Steel Corp.*, OSHRC Nos. 10611, 11327, 13320, and 14366, 5 O.S.H.C. 1495 (1977), *petition for review denied*, 584 F.2d 638 (3d Cir. 1978). Thus, in the Commission's view, the substitution of "design specifications" for ANSI's "construction and installation" language changed nothing.

Although we have recognized that the Secretary's interpretation of his own regulation, when affirmed by the Commission, must be accorded substantial weight, *Irvington Moore v. OSHRC*, 556 F.2d 431, 434 (9th Cir. 1977), it carries much less weight when at odds with the Commission's. Moreover, the Secretary's interpretation is less compelling when a regulation has been adopted from a consensus standard. *Bethlehem Steel Corp. v. OSHRC*, 573 F.2d 157, 160 (3rd Cir.). *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

In any event, we believe the plain wording of the standard opposes the interpreta-

tion tendered by the Secretary. *Marshall v. Pittsburgh-Des Moines Steel Co., supra,* 584 F.2d at 642. Section IV of the ANSI Code Introduction was not design oriented; (b)(2) derived directly therefrom. The provisions of (e)(4) and (g)(3)(i) were derived from the ANSI "construction and installation" requirements and therefore are "design specifications" within the meaning of (b)(2). *Id.* at 643. We, therefore, must determine whether (b)(2) is mandatory.

## III.

### IS (b)(2) MANDATORY OR ADVISORY?

### A. The ANSI Requirement.

As already mentioned, although the ANSI Code which underlay the adopted OSHA regulations clearly distinguished between rules governed by "shall" and "should," Part IV of the code's introduction provided that "[e]quipment installed prior to that date *should* be modified . . . unless" certain conditions are met. This appears to be a hybrid, neither wholly "shall" nor wholly "should." Further complicating is the fact that in one sense all ANSI standards as such are advisory.

Nonetheless, the Secretary argues that this hybrid language was intended by the draftsman of the ANSI standards to be mandatory. To excuse only when certain conditions exist, he asserts, is to require them when they do not. Commissioner Cleary, dissenting from the Commission's decision in *United States Steel Corp., supra,* 5 O.S.H.C. at 1300, so argued in regard to (b)(2):

> The term "should" must be read in light of the full context of the provision, including its "unless" clause permitting an exception upon a showing of a lack of feasibility. Plainly the exception is redundant unless the provision for a crane modification is mandatory.

On the other hand, the intent to make mandatory is unmistakable when "shall . . unless" language is used. "Should . . unless" language is clearly *more* advisory. The Commission and the Third Circuit have been persuaded by this distinction.

[O]f the eight other ANSI rules that incorporate such conditional language, seven use the mandatory "shall . . . unless" "shall not . . . unless," or "shall not . . . except." The only conditional ANSI rule that uses the "should . . . unless" formula is Section 2–3.3 (signals), which is advisory in its entirety.

*Marshall v. Pittsburgh-Des Moines Steel Co., supra,* 584 F.2d at 643.

On balance, we believe it more reasonable to assume that draftsmen of the ANSI standards intended existing cranes not to be required to meet all the substantive standards. We believe ANSI members reached a consensus that to be in compliance with the standards newly constructed cranes must conform to the rule. As to existing cranes, however, compliance was only suggested; noncompliance would not constitute an infraction. Rejection of the Secretary's understanding of what the ANSI draftsmen intended requires that we determine whether (b)(2), as promulgated by the Secretary, departs from that intention.

### B. The Secretary's Adoption.

The "should . . . unless" language of (b)(2) reflects the same hybrid character it possessed under the ANSI standards. It lends itself to the same arguments. More specifically, the Secretary argues: (1) that construing (b)(2) as mandatory is consonant with his authority under § 6(a) of OSHA which provides for promulgation of standards that *require* compliance; (2) that inasmuch as an earlier version of (b)(2) clearly provided for mandatory requirements, using the word "shall" rather than "should," and the Secretary in adopting the amendment stated that no substantive changes were being made, (b)(2) was intended to be mandatory; (3) that an interpretation that the provisions are mandatory comports with the remedial purpose of the legislation; (4) that the Secretary's interpretation is entitled to great weight; and (5) that case law recognizes that the word "should" can be mandatory in certain contexts. The Third Circuit agreed with the

Secretary. *Marshall v. Pittsburgh-Des Moines Steel Co., supra,* 584 F.2d at 643. We decline to do so.

Each of the five points raised by the Secretary has merit. Our construction of (b)(2), however, relies heavily on the August 13, 1971 modification. The original version of (b)(2) without question made (e)(4) and (g)(3)(i) mandatory as to pre-existing cranes. It read *"shall* be modified." In addition, the preamble to the original adoption in Part 1910 stated: "The national consensus standards contain only mandatory provisions of the standards . . . ." 36 Fed.Reg. 10466 (May 29, 1971). In modifying (b)(2) on August 13, 1971, the Secretary gave three explanations: (1) he was making no substantive changes in the standard; (2) he was "giv[ing] some time for the modification of existing . . . cranes"; and (3) the (b)(2) modification was intended to alter the adopted national consensus standard "to reflect accurately the American National Standards Institute (ANSI) standard from which the provision is derived." 36 Fed.Reg. 15101 (Aug. 13, 1971).

The Secretary now emphasizes the first of these explanations. The original (b)(2) was mandatory; the amended standard made no substantive change; therefore, (b)(2) continues to be mandatory. We, like the Commission, emphasize the Secretary's third explanation. The ANSI precursor to (b)(2) was merely advisory as to these cranes; (b)(2) was modified so that it would reflect the ANSI standard accurately; therefore (b)(2) is advisory. *United States Steel Corp., supra,* 5 O.S.H.C. at 1293. We so hold.

We recognize that no interpretation can eliminate the ambiguity in the regulation; our construction cannot fully harmonize the conflicting language in (b)(2). Nevertheless, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir. 1976). *See Usery v. Kennecott Copper Corp.,* 577 F.2d 1113, 1119 (10th Cir. 1977); *Brennan v. OSHRC,* 488 F.2d 337 (5th Cir. 1973); 4 *Davis, Administrative Law Treatise* § 30.12. Were we to interpret (b)(2) as the Secretary would wish, a further serious question regarding its validity would arise.[5] Inasmuch as it is equally

---

5. The first question that would be raised became the deciding issue in *Marshall v. Pittsburgh-Des Moines Steel Co.,* 584 F.2d 638 (3d Cir. 1978). The Third Circuit court concluded that the Secretary intended to make (b)(2) mandatory in its entirety. Nevertheless, the court denied the petitions to review Commission decisions, affirming the vacating of citations issued for pre-existing cranes. The court held that the Secretary exceeded his powers under 29 U.S.C. § 665(a). It stated:

We have not found, however, that the framers of the ANSI Code were in substantial agreement that Section IV was mandatory; thus the Secretary could not adopt that rule as a national consensus standard and give it mandatory effect.

584 F.2d at 643. *Accord, Usery v. Kennecott Copper Corp.,* 577 F.2d 1113 (10th Cir. 1977). The Commission, in interpreting (b)(2) as it does, also has recognized that the contrary construction would raise the question of the Secretary's power to amend substantively an ANSI standard without resort to rulemaking proceedings prescribed by section 6(b) of the Act. *United States Steel Co., supra,* 5 O.S.H.C. at 1293 n.5.

This court has not previously decided this question. In *Greyhound Lines-West v. Marshall,* 575 F.2d 759 (9th Cir. 1978), this court considered the Secretary's power to extend pre-existing federal standards through the adoption process of § 6(a) of OSHA. The underlying regulation in that case had been established under the Walsh-Healy Act of 1936. The Walsh-Healy standards were incorporated as OSHA standards, but extended to a broader set of work areas, hence to a broader class of workers. This court agreed with the Tenth Circuit that the Secretary had the power to extend protection of federal standards. The Tenth Circuit had concluded:

Indeed the principal purpose to be served by adopting standards established under previous federal statutes as standards under the Act was to extend protection to many workers who had not been covered by previous standards.

*Lee Way Motor Freight, Inc. v. Secretary of Labor,* 511 F.2d 864, 869 (10th Cir. 1978). Because we have concluded that the Secretary did not intend (b)(2) to extend protection beyond that conveyed by the underlying ANSI standard, we need not decide whether the rationale in *Greyhound Lines-West* would extend to a

reasonable to construe (b)(2) to be advisory in this context, we need not grasp to interpret the regulation otherwise so as to bring into question its validity.[6]

We, therefore, agree with the Commission's interpretation of (b)(2). The (e)(4) and (g)(3)(i) standards are advisory as to cranes installed before August 31, 1971. The parties stipulated that the citations were issued for noncompliance with (e)(4) and (g)(3)(i) by such cranes. The administrative law judge correctly vacated the citations and proposed penalty. We consider no other issues argued before us.[7]

The order of the Commission vacating the citations and proposed penalty is AFFIRMED. The petition for review is DENIED.

---

national consensus standard adopted by a nationally recognized standards-producing organization. *Cf. Usery v. Kennecott Copper Corp., supra* (where "should" in ANSI rule changed to "shall" in § 6(a), adopted regulation invalid because not national consensus standard).

In addition, if we held (b)(2) to be mandatory, a second issue, one not raised in *Pittsburgh-Des Moines Steel Co.,* would be raised here. The Secretary argues that Anaconda was required by 29 U.S.C. § 655(f) to attack this citation in a pre-enforcement review. He contends that Anaconda's argument makes a procedural attack on the regulation and was not brought within 60 days of promulgation. *See National Industrial Constructors, Inc. v. OSHRC,* 583 F.2d 1048 (8th Cir. 1978); *Atlantic & Gulf Stevedores v. OSHRC,* 534 F.2d 541 (3d Cir. 1976). Because we hold that the standard was advisory, no such attack need be reached.

6. Previously we have held that although a section may be artlessly and ambiguously drafted, the Secretary's interpretation nevertheless is entitled to a certain deference. *California Stevedore & Ballast Co. v. OSHRC,* 517 F.2d 986 (9th Cir. 1975). In *Irvington Moore v. OSHRC,* 556 F.2d 431 (9th Cir. 1977), we upheld the Secretary's interpretation of a regulation as reasonable. But there the Commission had agreed with the interpretation of the Secretary. We stated: "Our task is to determine whether the *agency's* reading of the regulations is reasonable and whether the regulations are not unduly vague." 556 F.2d at 435 (Emphasis added). In this case, by contrast, the Commission has repeatedly rejected the Secretary's interpretation of (b)(2). But even were we to grant normal deference in this case, we cannot believe the Secretary intended to do more than incorporate the ANSI standard as it existed.

The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and obligation to amend.

*Bethlehem Steel Corp. v. OSHRC,* 573 F.2d 157 (3d Cir. 1978), citing *Irvington Moore v. OSHRC, supra.*

Nor can mere citation to OSHA's remedial purpose "to assure so far as possible every man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651, substitute for analysis of the problem at hand. Courts do attempt to construe implementing regulations liberally to afford workers maximum protection, narrowly construing exemptions. *G.A.F. Corp. v. OSHRC,* 183 U.S.App. D.C. 20, 561 F.2d 913 (1977); *Irvington Moore v. OSHRC,* 556 F.2d 431, 435 (9th Cir. 1977); *Southern Ry. Co. v. OSHRC,* 539 F.2d 335, 338 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1969). But OSHA also sought to "build[] upon advances already made through employer . . . initiative" to provide safe conditions. 29 U.S.C. § 651. The regulations at hand incorporated previous employer safety efforts. We are bound to *construe* these regulations, not create them ourselves. We believe the Secretary altered the original (b)(2) language to conform (b)(2) to the original ANSI standard. This intention overrides obvious ambiguity in the wording of the regulation itself. Thus that "should," in other contexts, has been interpreted to be mandatory does not control. We do not find it anomalous that under present regulations workers on new cranes are protected, but workers on older cranes are not. *See Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649–50 (5th Cir. 1976). The Secretary—not the Commission or the courts—has the power to extend protection at any time.

7. We do not consider whether the Secretary had power under § 6(a) to promulgate a mandatory standard as to these cranes, whether Anaconda's attack is a procedural attack on a regulation that is time barred by § 6(f), or whether if mandatory as to pre-existing cranes (b)(2) is so vague as to deny due process as applied to Anaconda.