Mary E. BJUSTROM, individually, and on behalf of all others similarly situated, Plaintiff,

v.

TRUST ONE MORTGAGE, Defendant.

No. C00–1166P.

United States District Court, W.D. Washington.

Oct. 26, 2001.

Mark Adam Griffin, Keller Rohrback, Seattle, WA, Hart Robinovitch, Barry Reed, Zimmerman Reed, Scottsdale, AZ, for plaintiff.

Phillip R. Schenkenberg, Briggs & Morgan, St. Paul, MN, Henry C. Jameson, Deborah L. Best, Scott Roberts Weaver, Jameson Babbitt Stites & Lombard, Seattle, WA, Alan Maclin, Robert Pratte, Margaret Savage, Mark Schroede, Briggs & Morgan, Minneapolis, MN, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

PECHMAN, District Judge.

Ms. Bjustrom, as a representative class member, alleges that defendant Trust One Mortgage Corporation ("Trust One") has engaged in a uniform business practice of charging, collecting, and exchanging excessive closing fees with sponsored mortgage brokers on Federal Housing Administration ("FHA") mortgage loans. Plaintiffs have asserted causes of action for breach of contract, violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, 2607 ("RESPA") (2001), and the Washington State Unfair and Deceptive Trade Practices Act, RCW § 19.86 (2001). Because the Court finds that there is no 1% cap on closing fees, as plaintiffs contend, defendant's Motion for Summary Judgment, (Dkt.No.118), is GRANTED.

### Background

Trust One is a mortgage lender based in Irvine, California, which funds FHA loans it originates as well as those processed by mortgage brokers who refer the loans to Trust One for funding. These mortgage brokers, formally termed "loan correspondents," are sponsored by Trust One, who by law is responsible for the acts of the

mortgage brokers in originating loans. 24 C.F.R. § 202.8(7) (2001). Mortgage brokers receive compensation for their work through numerous fees and charges, which are regulated by the Department of Housing and Urban Development ("HUD"), the agency that oversees the FHA. Conventionally, mortgage brokers will charge a 1% loan origination fee. Plaintiffs contend that, under HUD rules and RESPA, this 1% fee caps the amount of compensation that mortgage brokers may receive for services in originating and closing an FHA loan.

If there exists a 1% origination fee cap, by defendant's admission Trust One and the mortgage brokers it sponsors will be in violation HUD rules. In addition to the 1% origination fee, collected directly from the borrower, mortgage brokers also receive payments from the lender, Trust One, in the form of "yield spread premiums" and "service release premiums." "Yield spread premiums" are payments by the lender to the mortgage broker on an "above par" loan brought to the lender by the broker. An "above par" loan is one above the "wholesale" rate, the lowest rate a lender will offer without charging the borrower by assessing discount points. The higher the loan is above par, the higher the yield spread premium that Trust One pays the mortgage broker. This higher payment is not for any particular work that the mortgage broker has done, but rather depends on the daily "rate sheets" published by Trust One that disclose to the mortgage broker its par rate and its yield spread premiums. Similarly, Trust One pays "service release premiums" to mortgage brokers based on the amount of the loan referred to Trust One to "service." A larger loan has more valuable "servicing rights" because the interest paid by the borrower will be greater. Again, the premium does not depend necessarily on work performed by the mort-

gage broker, but instead is a flat rate that increases as the mortgage broker refers larger loans. Mortgage brokers do not, as a practice, disclose information relating to how their income increases with the referral of larger and higher interest loans, but both yield spread and service release premiums are disclosed on the borrower' HUD–1 Settlement Statement. (*See, e.g.,* Compl. Ex. A at 1).

The details of Ms. Bjustrom's loans illustrate the contested payments to mortgage brokers at issue in this case. Ms. Bjustrom's FHA loan to purchase a residence was processed by mortgage broker Mortgage Specialists Inc. in 1999. She closed on the FHA loan transaction with Trust One, obtaining a loan for $140,542.00 at 8%. (Compl. at Ex. B). According to the HUD–1 Settlement Statement laying out the charges in the mortgage, Ms. Bjustrom paid $7,478.27 in settlement charges. (Compl. at Ex. A). Among these charges were a $1,374.00 origination fee to Mortgage Specialists, Inc., as well as various other appraisal fees, insurance, taxes, and recording fees. *Id.* Both the yield spread premium of $702.71 and the service release premium of $1,786.78 are included on the HUD–1. They are, however, listed in a separate category and not included under the category of services paid by the borrower. Plaintiffs challenge the fees paid to the mortgage broker in excess of the 1% origination fee.

This Court granted class certification to review the 1% fee cap issue. (Dkt. No. 109). First, the Court certified a class of persons who were charged more than 1% of the principle of their loan for the originating and processing of the loan. Specifically, the class consists of:

> All persons residing in the United States who, dating back the length of the applicable statute of limitations for a breach

of contract claim, from the date the Complaint was filed through and including the present:

1. Obtained an FHA mortgage loan funded by Trust One;

2. Written on a standard FHA mortgage contract similar to Plaintiff's in limiting the fees and charges collected to those authorized by the Secretary of HUD;

3. Where the loan was registered with Trust One for funding by a mortgage broker or loan correspondent;

4. Where the aggregate fees charged and collected for originating and processing the loan by way of direct or indirect fees (including, any loan original fee or yield spread premium tied to the interest rate on the loan, however denominated) exceeded 1% of the aggregate loan amount.

This Court also certified a RESPA subclass that includes:

All persons who, within one year from the date the Complaint was filed through and including the present:

1. Obtained an FHA mortgage loan funded by Trust One;

2. Where the loan was registered with Trust One for funding by a mortgage broker or loan correspondent;

3. Where a yield spread premium, service release premium and/or lender paid broker fee, however denominated, was paid by Trust One to the mortgage broker or loan correspondent;

4. Where aggregate loan origination fees (all fees for loan origination and processing services, however denominated), equal to or exceeding 1% of the loan amount, were also charged.

The parties agree on the facts, leaving only issues of law. There is no dispute that plaintiffs are charged more than 1%

of their total loan amount in compensation to the broker. There is no dispute that the payment of yield spread and service release premiums, specifically, raise mortgage broker compensation above the alleged 1% cap.

### Analysis

Three dispositive matters of law are raised by the certified class and subclass:

1. Does a 1% "origination fee" cap broker compensation?

2. Do yield spread and service release premiums equal to or exceeding the 1% cap violate HUD regulations?

3. Do yield spread and service release premiums violate RESPA?

In accord with the certified class, defendant admits that it pays yield spread and service release premiums that raise payments to mortgage brokers above the alleged 1% cap. Since the only disputed issues are matters of law, and there are no material issues of fact, this case is appropriately decided on summary judgment. Fed.R.Civ.P. 56(c).

### I. 1% Fee Cap

■ The 1% fee cap plaintiffs allege is not a statutory provision, but a HUD regulation. Analysis shows that HUD could promulgate such a rule under the authority Congress has granted to administer the mortgage insurance program. However, an examination of the regulation does not show HUD's intent to limit permissible fees to a 1% origination fee.

■ The mortgage insurance program fits closely with HUD's congressional mandate to realize "the goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441 (2001). The mortgage insurance program was established with the creation of the Federal Housing Administration in 1934.

National Housing Act of 1934, § 203, Pub.L. No. 73–479, 48 Stat. 1246 (codified as amended 12 U.S.C. §§ 1701—50), 12 U.S.C. § 1709 (2001). In the words of another District Court, the mortgage insurance program was passed: "in response to a perceived housing shortage for low income families." *Brown v. Lynn*, 385 F.Supp. 986, 989 (N.D.Ill.1974). The program, as the Court describes, "is designed to make homes more accessible to low income families by means of extensive mortgage insurance which will permit mortgagees to accept limited down payments, reduced interest rates, and longer maturities than are otherwise available in the market." *Id.*

█ Although Congress itself did not set the 1% cap, it did grant HUD the authority to pass such legislation. The statute governing mortgage insurance gives HUD considerable authority to manage the details of eligible mortgages, for example by setting permissible charges and fees. While the exact authorizing provision for the 1% cap is not clear, a number of statutory provisions might allow HUD to set a 1% cap on mortgage broker fees. First, HUD is given authority to promulgate rules and regulations to carry out the statutory provisions of the mortgage insurance program. 12 U.S.C. § 1715b (2001). Broadly, and within the limits of the statute, HUD is authorized to set the terms of the mortgages it insures:

> "The Secretary is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage offered to him which is eligible for insurance as hereinafter provided, and, *upon such terms as the Secretary may prescribe*, to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon." *Id.* § 1709(a) (emphasis added).

While the principle loaned (the "principle obligation") is more closely regulated, HUD has more discretion regarding miscellaneous fees and charges. HUD may "establish the terms of insurance under this section and approve the initial service charges, appraisal, inspection and other fees." *Id.* § 1709(b)(2). Consequently, HUD has the authority to promulgate a rule such as the 1% cap, particularly if designed to keep mortgage prices down while still allowing access to housing loans, in keeping with legislative intent. HUD has, in fact, exercised its authority to regulate what constitute mortgages "eligible" for insurance, fleshing out considerably the statutory provisions of 12 U.S.C. § 1709. *See, e.g.,* 24 C.F.R. § 203.17—203.25 (2001).

Plaintiffs find the 1% cap in their reading of the HUD rule regarding single family mortgage insurance currently codified as 24 C.F.R. § 203.27(a)(2)(i). This rule reads, in applicable part:

> "(a) The mortgagee may collect from the mortgagor the following charges, fees, or discounts; ... (2) A charge to compensate the mortgagee for expenses incurred in originating and closing the loan, the charge not to exceed; (i) $20 dollars or *one percent of the original principle* of the mortgage." *Id.* (emphasis added).

Plaintiffs contend that this rule limits compensation to mortgage brokers for services and expenses incurred in originating and closing an FHA loan to one percent of the original principal amount of the mortgage. Apparently this is an issue of first impression, with no court as of yet ruling on whether or not the 1% cap exists. Because of the novelty of the claim, and the parties' indication that this decision will be appealed regardless of the outcome, the Court issues a more detailed analysis.

Although not immediately obvious from the language of the statute, Section 203.27 applies to the actions of the mortgage brokers. According to section (a), a "mortgagee" may not "collect" from a "mortgagor" charges not included in the enumerated list. *Id.* § 203.27(a). A "mortgagee" may be either a lender or an sponsored mortgage broker (labeled a "loan correspondent lender"). *Id.* §§ 203.10(f), § 202.2, 202.8. A "mortgagor" is a prospective borrower. *Id.* § 203.10(f). Consequently, the rule in question clearly applies to mortgage brokers sponsored by lenders to make FHA loans. Trust One is a sponsoring lender, and plaintiffs allege its liability under rules holding sponsors "responsible" for the action of loan correspondence lenders. *Id.* § 202.8(b)(6).

A plain reading of 24 C.F.R. § 203.27(a) allows mortgage brokers to collect certain fees beyond the 1% "origination fee" to be collected from the borrower. Subsection (a) states that "the following" charges, fees, or discounts may be collected from a borrower, and then proceeds to list four subcategories. *Id.* The 1% origination fee is the first of the four subcategories. *Id.* § 203.27(a)(2) (subsection (1) is reserved). The second subcategory allows for the mortgagor to charge the borrower for recording fees and taxes, credit reports, surveys, title examination and insurance, appraisal fees, as well as other "reasonable and customary charges as may be authorized by the Commissioner." *Id.* § 203.27(a)(3). The third subcategory allows for charges for discounts, and the fourth for certain interest. *Id.* § 203.27(a)(4),(5). The fact that these items are organized in a consecutive list of permitted payments indicates that they may all be charged. There is no indication in the language or structure of the statute to suggest that subcategory (2) subsumes all the other parallel, numbered subcategories. Consequently, Ms. Bjustrom and any other class members may be charged an appraisal fee, a tax service fee, as well as other fees authorized by 24 C.F.R. § 203.27(a)(3),(4) and (5) *in addition to* the 1% charge allowed by subsection (a)(2).

The conclusion that Section 203.27(a) lists separate authorized charges is supported by the historical structure of the provision. Before it was codified in its present form, the different charges were numbered separately as application payments (24 U.S.C. § 521.21), execution charges (§ 521.23), service charges (§ 521.24), and other approved charges (§ 521.25). 11 Fed.Reg. 9229–23 (1946). The current structure merely indicates that all of these separate charges were included into one numbered provision. Neither is it determinative that the 1% charge is currently placed first among fees. As indicated by its present numbering, the 1% charge listed as subcategory (2) formerly followed a subcategory (1). The former subcategory (1) was an application fee provision previously numbered separately. *See* 24 C.F.R. § 202.27(a)(1) (1970); 36 Fed.Reg. 24508 (1971); 24 U.S.C. § 521.21 (1946). The 1% "origination fee" is merely one of a number of charges that may be collected from a borrower.

## II. Yield spread and service release premiums above the 1% origination fee

The above analysis, however, does not answer the question of the legality of yield spread and service release premiums when, added to any origination fee, they amount to more than 1% of the principle of the loan. If these premiums are to be categorized under 24 C.F.R. § 203.27(a), they would fall under the 1% charge subcategory (a)(2), since they are compensation for "expenses incurred in originating

and closing the loan" and do not fit into any of the other more narrow provisions cited above. Specifically, premiums are not compensation for specific expenses, as are items charged under subcategory (a)(3). Nor are premiums charges for discount points or specific interest under (a)(4) and (5). As part of "total compensation" paid to mortgage brokers, these premiums offset general expenses and provide profit. Indeed, premiums may represent the most significant source of payment to a broker on a mortgage. In the case of Ms. Bjustrom, for example, the yield spread and service release premiums provided $2,459.49 to the mortgage broker, while the 1% origination fee was only $1,374. (Compl. at Ex. A). Consequently, if yield spread and service release premiums are regulated by 24 C.F.R. § 203.27(a)(2)(i), as plaintiff alleges, mortgage brokers may be limited to collecting an "origination fee" and premiums that together total no more than 1% of the principle of the loan. If this is the law, then defendants by their own admission would be in violation.

The parties offer two alternative readings of the rule that a lender or mortgage broker may "collect" from the borrower a charge not to exceed "$20 or one percent of the original principal amount of the mortgage" in compensation for "expenses incurred in originating and closing the loan." 24 C.F.R. § 203.27(a)(2)(i) (2001). There is no dispute that the lender immediately pays the mortgage broker the yield spread and service release premiums, and that the premiums are the expected profit from money the borrower will pay in the future as interest payments. Plaintiffs allege that the premiums are, therefore, ultimately "collected" from the borrower through their interest payments. Defendants argue that the payments are not "collected" from the borrower, since the lender pays them to the mortgage broker.

■ This Court concludes that defendants' interpretation of the regulatory language is more compelling. A plain reading of the rule should understand the phrase "collect from the mortgagor [borrower]" to mean collect *directly* from the borrower. *Id.* § 203.27(a). Yield spread and service release premiums are directly collected by the mortgage broker from the lender, not the borrower. The assertion that all borrowers ultimately pay for the yield service and service release premiums through higher interest rates is too strained a reading of "collect" to compel inclusion of such *indirect* payments. The Court cannot conclude from the record that, as a class, all persons paying premiums are necessarily paying higher interest specifically for that premium. HUD, for example, maintains that the proper use of premiums is to allow borrowers to pay lower cash up front in return for higher interest rates. RESPA Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b) at 5, ___ Fed.Reg. ___ (October 12, 2001) ("RESPA Statement of Policy 2001"). What is certain is that lenders are giving up part of their profit in payments to mortgage brokers in order to attract loan servicing rights. While this raises questions of referral fees and kickbacks under RESPA, it does not qualify as a payment collected from the borrower. As long as mortgage brokers collect these premiums directly from the lender, not the borrower, they do not violate section 203.27(a).

The exclusion of interest rates from section 203.27 also compels the interpretation that yield spread and service release premiums paid by the lender do not violate the rule. Section 203.27 does not limit all money that can be collected from a bor-

rower, and most significantly does not include interest payments. These interest payments obviously encompass lender profit, from "servicing," after the loan is closed. Loan interest is regulated by another provision of the HUD rules, which liberally allows the parties to set a rate agreed upon between the borrower and the lender or mortgage broker. 24 C.F.R. § 203.20(a) (2001). A lender who originates and closes a loan receives from the buyer immediate payments, in the form of origination and other fees, as well as future interest payments. HUD statements indicate that these interest payments are critical to cover costs. *See, e.g.,* Deregulation of Mortgagor Income Requirements, 54 Fed.Reg. 38646, 38646 (Sept. 20, 1989) ("[W]hile the loan origination fee cap may be set below the cost of providing loan origination services, the shortfall is easily recovered by charging higher interest rates."). Since section 203.27 does not regulate interest payments, and mortgage brokers are paid by lenders in expectation of interest payments, yield spread and service release premiums should not be considered part of the 1% cap. If lenders can collect interest payments to cover their expenses in originating and closing loans, they can pass on those expected payments to mortgage brokers for the same purpose and not violate section 203.27(a).

Reading section 203.27(a)(2)(i) to include premiums would create a distinction between lenders and mortgage brokers that appears contrary to the language and intent of the rule. Under defendants' interpretation of section 203.27, a mortgage broker may receive from the lender advances on the expected interest payments as part of their total compensation. Mortgage brokers would thus receive compensation much as lenders do, from both the immediate payments as well as future interest payments. Under plaintiffs' interpretation, however, mortgage brokers are placed in a distinctly disadvantaged position of only being able to collect a 1% "origination fee" as compensation. In Ms. Bjustrom's case, for example, broker compensation from premiums and the origination fee would have been reduced from over $3,800 to below $1,400. (Compl. at Ex. A). Plaintiff's interpretation would also lead to the incongruous result that mortgage brokers who chose to not only process the loan but also initially fund it would be able to enjoy additional payments represented by premiums by selling the loan after settlement. *See* RESPA Statement of Policy 2001 at 5. Certainly HUD could choose to implement a 1% cap policy to limit mortgage broker compensation, but nowhere in section 203.27 do we see the intent to distinguish mortgage brokers from lenders. They are both "mortgagees." 24 C.F.R. § 203.27(a) (2001). Given that these regulations were adopted over 50 years ago, long before mortgage brokers became the issue they are today, the Court believes it would be wrong to read the regulation to substantially prejudice some mortgage brokers. Since payment in the form of interest is allowed to lenders, the Court will not read into an otherwise neutral regulation to eliminate this form of payment to mortgage brokers as well. Defendants' interpretation harmonizes the position of mortgage brokers and lenders, rather than creating a significant difference between them as plaintiffs' interpretation would.

The language of section 203.27 is best read to limit up-front charges directly to the borrower to a 1% "origination fee," along with the other specific allowed charges of the section. In order to avoid reading an effective elimination of compensation from interest payments to mortgage brokers, this Court concludes that collecting from the borrower means collecting *directly* from the borrower, and does not

apply to *indirect* payments of yield spread and service release premiums from the lender to the mortgage broker.

■■■ The Court is further convinced of this interpretation of the rule by HUD documents commenting on yield spread and service release premiums. Although HUD by all accounts consistently approves mortgages that contain yield spread and service release premiums above the alleged 1% cap, neither party has produced a definitive position statement of HUD on the issue. Given HUD's consistent approval of these loans, as well as the absence of the mention of any alleged 1% cap in the various policy statements regarding the extensive litigation of yield spread premiums, the Court concludes that HUD's interpretation of section 203.27(a)(2) allows yield spread and service release premiums. The Court defers to the reasonable interpretation by an agency of its own regulations.

HUD's position on the 1% origination fee cap is demonstrated through their regular approval of yield spread and service release premiums above the cap. The very section 203.27 that plaintiffs argue establish the 1% cap also requires HUD to review all mortgage applications for compliance with the rule:

> "Before the insurance of any mortgage, the mortgagee shall furnish to the Secretary a signed statement in a form satisfactory to the Secretary listing any charge, fee or discount collected by the mortgagee from the mortgagor. All charges, fees or discounts are subject to review by the Secretary both before and after endorsement under § 203.255." 24 C.F.R. § 203.27(d) (2001).

There can be no doubt that HUD is aware of the yield spread and service release premiums paid to the mortgage brokers, as they are listed on the HUD–1 and form a significant part of broker payment. Premiums are also significant payments, not likely to be simply overlooked consistently. Every loan in the class exceeded the alleged cap, and every loan was approved by HUD on these points. Extensive litigation on yield spread premiums, even though not necessarily alleging a 1% cap, has brought the issue of potentially excessive premiums to HUD's attention. "Since 1996, more than 150 class action cases are believed to have been filed around the country challenging the legality of YSPs [yield service premiums] as violative of Real Estate Settlement Procedures Act (RESPA) section 8." Robert M. Jaworski, *RESPA Section 8: The YSP Waiting Game Continues*, 56 Bus. Law. 1207, 1208 (May 2001). Consistent approval shows HUD policy has been to accept yield spread and service release premiums as separate from the 1% "origination fee" charge, unless violative of RESPA.

HUD has accepted yield spread and service release premiums by explicitly stating that the premiums do not violate RESPA *per se* and by establishing a total compensation test. In 1989, HUD considered removing the 1% "origination fee." Deregulation of Mortgagor Income Requirements, 54 Fed.Reg. 38646 (Sept. 20, 1989). HUD decided not to, explicitly referencing the ability of lenders to make up costs through interest rates,

> "Since a shortfall in mortgage origination costs can easily be recovered through adjustments to the mortgage loan interest rate, mortgagors are currently bearing loan origination costs (directly through loan origination fees and indirectly through mortgage interest rates) at the competitive level set in the marketplace. Therefore, the elimination of the loan origination fee cap would be expected to cause no change in the total origination cost for mortgagors." *Id.* at 38646–7.

Now that mortgage brokers occupy approximately 50% of the market, yield spread and service release premiums are the method that lenders use to shift profit from interest rates to mortgage brokers. Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10080–81 (March 1, 1999). Recent policy statements have accepted yield spread and service release premiums as a way of compensating mortgage brokers, so long as they do not violate the provisions of RESPA:

> "In a given transaction, a broker may receive compensation directly from the borrower, indirectly in fees paid by the wholesaler or lender providing the mortgage loan funds, or through a combination of both. Where a broker receives direct compensation from a borrower, the broker's fee is likely charged to the borrower at or before closing, as a percentage of the loan amount (e.g., 1% of the loan amount) and through direct fees (such as an application fee, document preparation fee, processing fee, etc.). Brokers may also receive indirect compensation from lenders or wholesalers. Such indirect fees may be referred to as "back funded payments," "servicing release premiums," or "yield spread premiums." *Id.* at 10081."

Nowhere in this 1999 policy statement, nor the most recent 2001 policy statement, does HUD address a 1% cap. Rather, in stating that premiums are not "illegal per se," HUD directs an inquiry to see if the premiums violate RESPA. 64 Fed.Reg. at 10082–83. This Court concludes that these statements indicate that HUD does not believe that the premiums should be analyzed under section 203.27. If the case were otherwise, since apparently almost all borrowers (like Ms. Bjustrom) are charged the 1% origination fee and "pay" premiums, HUD would have to consider these premiums to be *per se* illegal. Given the extensive litigation and clarification around yield spread premiums, the Court considers that HUD has elaborated a policy that yield spread premiums and service release premiums do not fall under the 1% origination fee cap.

 Certainly, evidence of HUD's interpretation of the rule in question is entitled to some deference. *See U.S. West, Comm., Inc. v. Washington Util. and Transp. Comm.,* 255 F.3d 990 (9th Cir. 2001). Normally, this Court would grant substantial deference to an agency's interpretation of its own rules. *Id.* However, the analysis of deference here is complicated given the ambiguity of the regulation and absence of a dispositive policy statement. Nonetheless, the Court will defer to HUD's interpretation as it is not erroneous or inconsistent with the regulation. *See Singh–Bhathal v. INS,* 170 F.3d 943, 945 (9th Cir.1999); *Department of Health Human Servs. v. Chater,* 163 F.3d 1129, 1135 (9th Cir.1998). Even in the case of an ambiguous rule, the Court defers to agency interpretation. *See Marshall v. Anaconda Co.,* 596 F.2d 370, 377 n. 6 (9th Cir.1979). *Marshall*'s admonishment, however, might be considered by HUD here to resolve this issue which only promises to result in more litigation: "The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and obligation to amend." *Id.*

As a regulation promulgated by HUD, where the plain language of the regulation agrees with the agency's interpretation, this Court defers to the reasonable agency interpretation.

### III. RESPA

Two RESPA issues are before the Court. Primarily, the Court granted certi-

fication of a class to determine whether yield spread and service release premiums above the 1% origination fee violate RESPA *per se.* Secondarily, the Court could rule on the issue of whether yield spread and service release premiums violate RESPA regardless of the amount. The first issue is resolved in favor of the defendant by the analysis above finding that yield spread premiums and service release premiums are not included in the 1% "origination fee" cap of 24 C.F.R. § 203.27(a)(2)(i). The second issue has been extensively litigated, generally producing a split between the 11th Circuit and the other jurisdictions that have considered the issue, though many of the relevant decisions are unpublished. *See, e.g., Culpepper v. Irwin Mortgage Corp.,* 253 F.3d 1324 (11th Cir.2001) ("*Culpepper III* "); *Levine v. N. American Mortgage,* 188 F.R.D. 320 (D.Minn.1999). Nonetheless, deference to a recent HUD policy statement explicitly rejecting the *Culpepper* analysis compels resolution in favor of the defendant.

Plaintiffs contend that yield spread premiums are kickbacks or referral fees under RESPA Section 2607. Section 8(a) of RESPA prohibits referral fees: "No person shall give and no person shall accept any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a) (2001). Section 8(c) of RESPA exempts certain payments from being considered referral fees: "Nothing in this section shall be construed as prohibiting (1) the payment of a fee ... (C) by a lender to its duly appointed agent for services actually performed in the making of a loan, (2) the payment to any person of a bona fide salary or compensation or other payments for goods or facilities actually furnished or for services actually per-

formed." *Id.* § 2607(c). HUD regulations adopt the above language almost verbatim. 24 C.F.R. § 3500.14 (2001).

The language regarding "services *actually* performed," however, led to litigation over whether or not yield spread premiums violated RESPA. In response to litigation on the issue of yield spread premiums, HUD issued a policy statement in 1999 intended to clarify the regulation and its interpretation of the statute. 64 Fed. Reg. 10080. HUD failed to unify the courts, and two opposing interpretations of the statute, regulations, and policy statements continued. The *Culpepper* interpretation required that specific services provided be linked to the yield spread premium paid. *Culpepper III,* 253 F.3d at 1329–30. The alternative interpretation argued that RESPA only required that services provided be "reasonably related" to "total compensation," tracking the language of the Senate Report on the RESPA bill. S.Rep. No. 93–866, at 6551 (1974); *See, e.g., Schmitz v. Aegis Mortgage Corp.,* 48 F.Supp.2d 877, 880 (D.Minn.1999).

On the day this Court heard oral argument in the case, HUD issued a clarification of its 1999 policy statement, explicitly rejecting *Culpepper* 's analysis. RESPA Statement of Policy 2001 at 11 ("HUD was not a party to the case and disagrees with the judicial interpretation regarding Section 8 of RESPA and the 1999 Statement of Policy."). Clearly trying to eliminate the possibility of class actions in RESPA cases, HUD states that "it is necessary to look at each transaction individually, including examining all of the goods or facilities provided or services performed by the broker in the transaction." *Id.* at 11–12. The first step of HUD's two-part test to interpret RESPA, then, is to apply this individual determination to see if com-

pensation is paid for goods or facilities provided or services performed. *Id.* Essentially, it appears that the first step will be passed if some goods or services are provided. *See Schmitz,* 48 F.Supp.2d at 880. The second step of the test looks to see if total compensation is reasonably related to the total set of goods or facilities actually furnished or services performed. RESPA Statement of Policy 2001 at 13. Here HUD specifically rejects the examination of whether services were actually provided specifically for the yield spread premium. "[T]he amount of the [premium] payment is not, under the HUD test, scrutinized separately and apart from total broker compensation." *Id.* at 4. From its statement, it appears that rates generally charged within an area will be the benchmark for determining the second step of the test. *Id.* at 14–15. Consequently, rather than looking to what services are provided in return for yield spread and service release premiums, it appears that HUD and courts will look to whether a particular charge for a mortgage significantly deviates from market rates in the area for similar services.

This Court is concerned that HUD's test will not effectively protect borrowers from mortgage brokers inflating interest rates. HUD does recognize the risk:

"HUD also recognizes, however, that in some cases less scrupulous brokers and lenders take advantage of the complexity of the settlement transaction and use yield spread premiums as a way to enhance the profitability of the mortgage transactions without offering the borrower lower up front fees. In these cases, yield spread premiums serve to increase the borrower's interest rate and the broker's overall compensation, without lowering up front cash requirements for the borrower." RESPA Statement of Policy 2001 at 9.

HUD is confident that the reasonable relation to total compensation test will sufficiently protect consumers. *Id.* Nonetheless, this Court is skeptical. By effectively closing off class action litigation, HUD forces potentially thousands of consumers to individually litigate their claims regarding a few thousand dollars, an unlikely proposition. HUD's apparent policy of looking to the market mortgage rates in an area may effectively mask cases where a higher interest rate has been charged without a corresponding decrease in upfront costs. This Court believes that a test closer to *Culpepper*'s, where HUD looks to see if consumers are actually receiving *something* for potentially higher interest rates, would be more effective. Nonetheless, the Court concludes that disagreement over effective policy is not enough to overcome the deference due to HUD's policy statement.

In reviewing an agency's construction of a statute, the Court must reject those constructions that are contrary to clear congressional intent or frustrate the policy that Congress sought to implement. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress' intent is clear, the Court must give effect to the unambiguously expressed intent of Congress, regardless of the agency interpretation. *Id.* at 843, 104 S.Ct. 2778. If Congress' intent is ambiguous or not clear, the Court looks to see if the agency's regulation is based on a permissible construction of the statute. *Id.; McLean v. Crabtree,* 173 F.3d 1176, 1181 (9th Cir.1999). This Court does not believe that the split in interpretations of the 1999 Policy Statement should decrease deference. *Young v. Reno,* 114 F.3d 879, 883 (9th Cir.1997) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to consid-

erably less deference' than a consistently held agency view.") (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). HUD has made clear its rejection of the *Culpepper* test, not as clearly as it should have in 1999, but certainly in 2001.

 While the Court is skeptical of HUD's policy preference, HUD's interpretation is nonetheless a permissible interpretation of the statute. Certainly, an investigation of whether total compensation is reasonably related to services provided is consistent with the purpose and language of RESPA in determining whether a referral fee or kickback was paid. In the words of another District Court, "by simply ensuring that the broker's total compensation is reasonably related to the goods or services the broker actually furnishes, the [1999] Policy Statement serves RESPA's primary goal of preventing kickbacks or referral fees that unnecessarily and unreasonably increase the costs of settlement services." *Levine*, 188 F.R.D. at 328. Finally, as noted above, the Senate Report on RESPA uses very similar language to describe an examination of whether a payment bears a reasonable relationship to the value of the services provided. S.Rep. No. 93–866, at 6551 (1974).

This Court cannot conclude that the 2001 policy statement is an impermissible interpretation of RESPA. Consequently, the Court defers to HUD in considering that yield spread premiums and service release premiums be examined through an individualized determination of whether total compensation is reasonably related to services provided. The Court refrains from examining the generally legality of yield spread and service release premiums on a class basis.

### Conclusion

The Court concludes that there is no general 1% origination fee cap on mortgage broker compensation. Additionally, the Court concludes that yield spread and service release premiums may be paid by lenders to mortgage brokers in addition to a 1% origination fee charged to borrowers. Therefore, defendant's Motion for Summary Judgment on the breach of contract claim, RESPA, and Washington State Unfair and Deceptive Trade Practices Act is GRANTED. The 1% fee cap and RESPA issues are likely to continue to be litigated across the country and within this Circuit. Before more funds are expended in this case, the Court feels the contested questions of law are best decided on immediate appeal for a clear statement of the law. This Court believes that an immediate appeal from this order to clarify a controlling question of law would materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

The Clerk is directed to send copies of this order to all counsel of record.